**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------
CODY A. BACKUS,

                                    Petitioner,

                                                            9:11-CV-00019 (RGK)

         v.

SUPERINTENDENT, UPSTATE CORRECTIONAL
FACILITY,

                                    Respondent.
-------------------------------------------------------------------------

APPEARANCES:                          OF COUNSEL:

CODY A. BACKUS, 08-B-0010
Petitioner, pro se
Clinton Correctional Facility
P.O. Box 2002
Dannemora, New York 12929

HON. ERIC T. SCHNEIDERMAN            ALYSON J. GILL, ESQUIRE
Office of the Attorney General       Ass't Attorney General
120 Broadway
New York, New York 10271

**RICHARD G. KOPF**
**Senior United States District Judge for the District of Nebraska (by designation)**

### DECISION and ORDER

         Claiming that he was denied ineffective assistance of counsel, Petitioner has filed an

amended petition for writ of habeas corpus under 28 U.S.C. § 2254.  Dkt. Nos. 1, 15, and 17.

Giving the decision of the state appellate court the deference it is due, the amended petition

is denied.

### I.  BACKGROUND

         Respondent agrees that the petition is timely, and that the claims resolved herein have

been exhausted.  In addition, Respondent has submitted the relevant records.  The trial

transcripts appear at Docket Number 10.  The state appellate records appear at Docket

Number 9.  It is from these records that the following summary is provided.

### A.  Procedural History

The People contended that in the early morning hours of September 9, 2006,

Petitioner, who was 21 years old or so at the time, and two others, tried to "rip off" James

Brennan after a disagreement about an earlier drug deal.  Brennan operated his drug

business on the second floor of a building.  When someone wanted to do business with him,

the prospective buyer would get Brennan's attention from the second floor window and

Brennan would throw down a key so the buyer could access the door to the first-floor walk

up.

The People claimed that after an earlier meeting with Brennan, Petitioner returned to

Brennan's haunt and went upstairs to meet with Brennan.  After that, it was claimed that

Petitioner went downstairs, ostensibly to get a cigarette, and returned to the second floor,

leaving the door unlocked for his accomplices.  Then, Shala Williams, who was armed with a

handgun, and Clarence Paige (who was 15 at the time) came upstairs.   Brennan was shot,

apparently by Williams, and later died.

An Onondaga Grand Jury charged Petitioner with one count of (felony) murder in the

second degree (while committing or attempting to commit robbery or burglary), one count of

criminal possession of a weapon in the second degree, one count of burglary in the first

degree, and two counts of attempted robbery in the first degree.   Petitioner entered a not

guilty plea, and a jury trial ensued.

One of Petitioner's alleged accomplices, Clarence Paige, testified for the People and

he implicated Petitioner as the ringleader.  The People offered other evidence including

2

damning statements that Petitioner had made to the police.  Petitioner's counsel presented evidence that a cell phone ostensibly used by Paige to communicate with Petitioner belonged to another person.  Petitioner's counsel also presented evidence from an alibi witness. Petitioner did not testify.

After asking several questions, including questions about cell phone records, the jury found Petitioner guilty on all counts save for the count regarding possession of a weapon in the second degree, and for that count Petitioner was acquitted.  The trial court sentenced Petitioner to a prison term of twenty years to life for the murder, and concurrent determinate terms of twenty years for the burglary count, and fifteen years each for the attempted robbery counts, to be followed by two and one-half years of post-release supervision.

### 1.  *Appellate Proceedings*

On direct appeal to the Appellate Division, Fourth Department, Petitioner's counsel claimed that: (1) the felony murder count was not properly charged in the indictment and should have been dismissed; (2) there was insufficient evidence to corroborate Clarence Paige's testimony; (3) the verdict was against the weight of the evidence; (4) the court erroneously responded to jury notes; and (5) counsel provided ineffective assistance by (a) failing to move to dismiss the felony murder count on the ground that it was duplicitous; (b) acquiescing in an erroneous jury instruction that shifted the burden of proof; (c) failing to object to the evidence that Petitioner was shown a photo array of Shala Williams; (d) failing to object to the prosecutor's summation comments; (e) failing to move for a trial order of dismissal on the ground that the People failed to prove Brennan's cause of death; (f) failing to request that the jury be instructed on the affirmative defense to felony murder; and (g) by

eliciting La'Tesa Anderson's in-court identification of Petitioner.  The People filed a brief in opposition, and then Petitioner submitted a reply brief.

On November 13, 2009, the Appellate Division affirmed Petitioner's judgment of conviction.  *People v. Backus*, 67 A.D.3d 1428 (4th Dep't 2009).  The court first rejected Petitioner's contention that the felony murder count did not charge a "cognizable crime" and was duplicitous because the claim was not preserved.  The court also found that, contrary to Petitioner's assertion, preservation was required because any error was not a jurisdictional defect.  *Id.* at 1429.  There was no jurisdictional defect because an "indictment is jurisdictionally defective" only if does not "charge the defendant with commission of a particular crime" and "the count of the indictment that is the subject of defendant's challenge expressly charges defendant only with felony murder."  *Id.* (internal quotation marks omitted).

The court next rejected Petitioner's contention that the court's supplemental jury instruction was erroneous, noting that Petitioner had consented to it.  The court also found that Paige's testimony, given as a cooperating witness, was sufficiently corroborated, and the evidence was legally sufficient to support Petitioner's conviction.  *Id.*

Next, the court rejected Petitioner's claim that counsel provided ineffective assistance of counsel for failing to make a motion or raise certain objections.  The court stated that "[a] defendant is not denied effective assistance of trial counsel merely because counsel does not make a motion or argument that has little or no chance of success."  *Id.* (quoting *People v. Stultz*, 2 N.Y.3d 277, 287 (2004)).

Finally, the court stated that it had "considered defendant's remaining contentions" and concluded "that they are without merit."  *Id.*  No further elaboration was provided.

By letter dated December 3, 2009, counsel sought leave to appeal to the New York Court of Appeals.  Petitioner highlighted the duplicitous felony murder charge issue, but asked the court to review all of the issues that were presented to the Appellate Division.  On January 10, 2010, a judge of the New York Court of Appeals denied petitioner leave to appeal to that Court.  *People v. Backus*, 13 N.Y.3d 936 (2010).

### 2. *Amended Habeas Petition*

In his petition for a writ of habeas corpus, dated December 30, 2010, Petitioner, relying on his Appellate Division brief, claims that counsel provided ineffective assistance by (a) failing to move to dismiss the felony murder count on the ground that it was duplicitous; (b) acquiescing in an erroneous jury instruction that shifted the burden of proof; (c) failing to object to the evidence that petitioner was shown a photo array of Shala Williams; (d) failing to object to the prosecutor's summation comments; (e) failing to move for a trial order of dismissal on the ground that the People failed to prove Brennan's cause of death; (f) failing to request that the jury be instructed on the affirmative defense to felony murder; and (g) eliciting La'Tesa Anderson's in-court identification of petitioner.

Judge McAvoy (to whom this case was previously assigned) allowed Petitioner to amend his petition to state a claim against his lawyer that the felony murder count was not "cognizable."  Dkt. No. 17.   The judge reasoned that the claim was similar to the allegation that trial counsel was ineffective for failing to move to dismiss the felony murder count as duplicitous and, as such, amendment of the habeas petition was proper, for among other reasons, because that claim had been exhausted.  Having briefed the related issue of ineffective assistance of counsel relating to the indictment being duplicitous, Respondent elected not to respond further.

Petitioner also attempted to raise a sufficiency of the evidence claim and a related "actual innocence" claim.  In addition, Petitioner sought a stay and abeyance order so he could pursue additional relief in state court through a writ of error coram nobis.  Judge McAvoy denied all of these attempts.

Applying *Rhines v. Webe*r, 544 U.S. 269, 277 (2005), Judge McAvoy ruled that the stay and abeyance request was untimely, as Petitioner had failed to show why he failed to exhaust the writ of error proceeding prior to filing his habeas petition.  Dkt. No. 17.

The judge ruled that the sufficiency claim did not relate back to the filing of the original petition, that it was barred by the AEDPA statute of limitations and, for purposes of equitable tolling, that Petitioner had not been diligent in pursuing the claim.  *Id.*

Finally, the judge ruled that an actual innocence claim is not normally considered as a free-standing claim but rather is considered as a gateway to a defaulted claim.  Furthermore, even if the actual innocence claim was considered, it was untimely (and not exhausted), as the actual innocence claim was based upon a predicate assertion[1] that had been addressed by a trial witness called by the defense, and also because the cell phone records upon which the predicate assertion was based were available at the time of trial.  *Id.*

### B.  Evidence at Trial

Only the evidence and trial proceedings especially pertinent to the issues to be resolved will be discussed.  Condensed and summarized, that information is described below.

---

[1]Petitioner claimed that Paige lied when he said he used a particular cell phone to speak with Petitioner.

6

Petitioner's defense was made difficult by the statements he voluntarily gave to the police.  Among other things, Petitioner admitted that he was at the scene of the crime seconds before the murder was committed.

The police contacted Petitioner, a young white man in his early 20s, on September 10, 2006, probably because one of Petitioner's telephone numbers was found on Brennan's cell phone.  Petitioner was not then a suspect and he was not under arrest, but he was given his *Miranda* rights and he waived them.

He gave a written statement to the police.  That statement was read to the jury:

> Q.    Detective, I'm going to hand you back now what's been received into evidence as Exhibit 9 and I'm going to ask you to read that for the jury.

> A.    Today is September 10th, 2006 and I am in the Criminal Investigations Division of the Syracuse Police Department speaking with Detective Randy Collins about a robbery that I witnessed early Saturday morning at about three something in the morning.  On Friday at about 4 p.m. my ex-girlfriend Jaleesah Hammonds and I hooked up.  I picked her up at her aunt's house in the Valley section of Syracuse at a house on the corner of Valley Drive and Midora Place.  We went to Liverpool where she now lives.  I was going to pick up some clothes of mine.  When we got clothes she went into the house to grab some clothes.  While I was sitting waiting in the car her cousin's boyfriend Trigg – T-R-I-G-G – came out and asked me for a cigarette.  Trigg said hi and then went back into the house.  Me and Jaleesah then drove to Noelle's house in the projects.  Noelle is another aunt of Jaleesah's.  We were there for about five minutes and I sat in the car and listened to some music.  We then went back to the house in the Valley and on my way I picked up two friends of mine, Ski – S-K-I – and Nov – N-O-V – we hung out at the house in the Valley while Jaleesah's aunt went shopping.  She used my car.  We were there for quite a while like three hours or so because Jaleesah's aunt went grocery shopping.  Ski and Nov were planning on leaving with me but since it took so long they got rides away from there before me.  I finally left at about 9:30 p.m. or so with Jaleesah.  We drove to Graves Street where I bought some Ecstacy from Jim.  We then bought some weed from somewhere else and drove around for a while.  We smoked weed and then I dropped her off at her house in Liverpool.  This was at about 10:30 or 11 p.m.  Then I went to my friend Pun's house in Liverpool – that's P-U-N – Pun's house in Liverpool and hung out for a while.  We went to the Cobblestone bar in Liverpool for a while.  I played some pool and hung out with Pun.  We left the bar at about 12 or so and

7

got some more weed. We drove to the north side and talked to some dudes for a little while.  We went back to the bar, but by then it was about to close so we went back to Pun's house in Liverpool.  We hung out there smoking weed and bullshitting for a while.  Then I started driving home, but when I got about halfway there I got a phone call from someone else I know that wanted some Ecstacy.  So I turned around and drove to Jim's house on Graves Street.  When I got there I yelled up to Jim's window.  A few minutes later Jim yelled out, Who is it?  I said, Cody.  I walked around to the door and a black girl opened the downstairs door for me.  On my way up the stairs with her she asked me for a cigarette.  I told her I had one in my car and that I would get it for her.  I went into Jim's apartment and told Jim I wanted 20 pills.  He threw two bags at me which contained 10 pills each.  I put the pills on the table and got out $250 and put that on the table.  I went down to my car and got that girl a cigarette and came back up.  She was sitting to the right of me on a couch in what I think was Jim's living room.  I've only been in his apartment two or three times so I don't know the lay out too well.  Jim was sitting in a chair to the left of me and I grabbed the money I had put on the table and I was going to count it to make sure there was enough there.  It was then that we heard some people come in the door to his apartment.  First I saw a black male.  He was walking toward Jim and then he lifted up a handgun with a long black barrel.  That is when that black girl got up and ran out of the apartment.  I heard some commotion at the front door but it didn't last long.  Then a second guy came walking in.  I had seen that there was another guy, but he was a little ways behind the guy with the gun and that black female must have had to go around him to get out.  The guy with with the gun was asking where the money was and they both jumped on him.  I realized that both of them were on Jim so I ran out of the apartment.  I was counting my money at the time and left most of it along with the pills sitting on the table and the couch.  I ran downstairs, got in my car and drove away.  I don't know and I have never seen that girl before.  She looked to be in her early twenties, dark skinned with braids.  I didn't hear Jim call her by name or anything.  It seems like she had something to do with what happened, but I can't be sure.  She just ran right out of there, but then again I ran out without being harmed also.  I drove around the block once before I left the area and I tried to call Jim, but he wouldn't answer his phone.  I had called Jim on  – – on the way I think – it's supposed to be on the way there, but I got some message from sprint like his phone was disconnected or something.  I asked him what his number was when I had got there and he told me he had a new number.  He called my phone with his new phone so I had the number when I got there.  I don't know about Jim getting shot and killed until later that day, Saturday when I saw that there was a homicide.  I did not hear any shots being fired when I was leaving.

Dkt. No. 10-3 at CM/ECF pp. 148-151.

After Petitioner gave the written statement to the police, one of the officers returned to the patrol car used to transport Petitioner.  Wedged between the back seat cushions of the patrol car, the officer found a cell phone.  The officer testified that no one else sat in that seat that day.  Dkt. No. 10-3 at CM/ECF pp. 226-230.

Using the phone found in the car, another police officer interviewed Petitioner later on September 10, 2006.  Among other things, Petitioner told the officer that the person who called him before he returned to Brennan's apartment to get Ecstasy was "Marc."  After that, Petitioner's cell phone was checked, and, while a "Marc" was found in the address portion of the cell phone, it was not among recently dialed calls.  Dkt. No. 10-3 at CM/ECF pp. 180-190.

The People presented evidence from various witnesses about the night in question, including the testimony of Paige, one of the alleged accomplices, who was 15 at the time of the murder.  Dkt. No. 10-3 at CM/ECF p. 9 and following. The totality of the witnesses' testimony made a strong case against Petitioner when read in light of the statements he gave the police.  The following picture emerged.

The jury heard from Paige's lawyer that Paige had entered into a deal whereby Paige would plead guilty to burglary and testify truthfully and, in exchange, receive one sentence of three and one third years to tens years.  Dkt. No. 10-2 at CM/ECF p. 156.  According to the lawyer, who had also served as a law professor at Syracuse University College of Law, there was "a different sentencing structure because [Paige] was 15 years old when the crime occurred."  Despite this sentencing structure, Paige was prosecuted as an adult.

On September 8, 2006, Paige testified that he was hanging out in the street with his girlfriend when he received a call from Petitioner at about 9:00 or 10:00 p.m.  Andrew Arnold, a custodian of records, testified that there was a phone call made from 315-575-1022 to 315-

863-1933 on September 8th, at 9:34 p.m.  Paige testified that the 315-575-1022 number belonged to Petitioner and the 315-863-1933 number belonged to Paige.  Petitioner told Paige that he had to "make a move," which Paige understood to mean that Petitioner was going to assault or rob someone.  Paige agreed to help Petitioner, who showed up about an hour later, driving a green Ford Explorer.

Petitioner first drove Paige to his aunt's house, where Petitioner waited outside about ten minutes, and then dropped off Paige at a friend's house.  Petitioner returned several hours later, between 2:00 and 3:00 a.m., and was riding in the passenger seat of a dark car that was being driven by a girl.  Shala Williams, who lived across the street from Paige, was in the backseat.

Paige got in the backseat and Petitioner said that he had to "make a move on somebody" who had "shorted him in E pills."  Then, Petitioner, Williams, and Paige drove to James Brennan's house, who lived on Graves and Highland Streets.

La'Tesa Anderson, who lived on the same street as Brennan, arrived at Brennan's house at around midnight.[2]  Anderson used a lot of drugs and lost custody of her children as a result of domestic violence.  Brennan provided Anderson with free drugs that night.  Brennan's roommate, Titus Stewart, was also there, but mostly stayed in his room.

At Brennan's house, several people came to buy drugs.  Brennan, who was heavy set, would generally throw the house keys out of the window if it was someone he knew, and the buyer would let him or herself into the house.  At one point, after Anderson had been there for

---

[2]The court reporter failed to include Anderson's name in the transcript index.  Anderson's examination begins at Docket Number 10-3 at CM/ECF page 102.  The court reporter also incorrectly labeled Anderson's testimony, on the heading at the top of each page of the transcript, as "Clarence Paige-Cross."

about two or three hours, she heard someone whistling outside and, after Brennan looked out the window, he told Anderson to go downstairs and open the door.  Anderson went downstairs and let a slim, bald, white man, who was about six feel tall into Brennan's apartment.  Brennan and Petitioner conducted a drug transaction.  Anderson was not really paying attention, but she noticed a bag of pills on the table.  In the apartment, Anderson asked Petitioner if he had a cigarette.  After a couple of minutes, Petitioner went downstairs to get the cigarette from his car.

When he returned, Anderson did not hear Petitioner lock the downstairs door.  A couple of seconds later the upstairs door burst open and Williams, who was armed with a black handgun, and Paige entered.  Anderson began screaming "no, no, no."  She then unlocked the upstairs door and ran out.  One of the guys chased her to the front door and locked it after Anderson ran home.

In Brennan's living room, Petitioner, according to Paige, was pushing Brennan and demanding to know "where the F" Brennan "put the stuff."  Dkt. No. 10-3 at CM/ECF p. 30.  Paige was standing closer to the kitchen and heard the gun go off.  Paige ran away.  Stewart, who was asleep in his bedroom, woke up, opened his door and saw Brennan, who told Stewart that he had been shot.  Stewart called 911, gathered his belongings and left the apartment.

Police Officer Jeffrey McManus was the first officer to arrive on the scene.  Dkt. No. 10-2 at CM/ECF p. 167 and following.  An ambulance arrived just after he did.  When McManus entered the living room, he saw James Brennan lying on the ground near the window.  Brennan was lying on his right side and Officer McManus noticed a small hole that

appeared to be from a gunshot wound.  Brennan was not able to speak; he just made a groaning noise.

Medical Examiner Abraham Philip[3] testified that he conducted an autopsy on James Brennan's body on September 9, 2006 (the same day Brennan was shot).   Dkt. No. 10-4 at CM/ECF p. 29.  The doctor, trained as a forensic pathologist, explained that the gunshot tore Brennan's liver and came to rest just below his stomach.  From the nature of the wound and powder burns, the doctor was able to determine that the gun was discharged less than one inch from Brennan's skin.  Although not offered into evidence, a detailed written autopsy report indicated that the "cause of death of this 37 year old man, is attributed to gunshot wound to torso" and the "manner of death is homicide."  Dkt. No. 9-2 at CM/ECF p. 96.  That report was given to the defense long before trial.  Dkt. No. 9-2 at CM/ECF p. 79.

The prosecutor also called Petitioner's former girlfriend, Jaleesah Hammonds.  Dkt. No.10-3 at CM/ECF p. 199 and following.  However, the direct examination of Hammonds did not go as the prosecutor planned, and, out of the presence of the jury, the prosecutor complained to the trial judge that Ms. Hammonds was giving testimony contrary to information she had provided in an earlier interview with the prosecutor.

In any event, Hammonds buttressed a portion of what Petitioner had said in his written statement to the police.  Hammonds testified that Petitioner picked her up between about 7:30 PM and 8:00 PM on September 8; that she was with Petitioner when he purchased drugs from Brennan early that evening (although she said the purchase took place on the street); and that Petitioner did not seem to be unhappy with the price Brennan charged.  She

---

[3]The court reporter erroneously indexed the witness's name as "Philip Abraham."

12

added that, after she returned home around between 10:00 PM and 11:00 PM, Petitioner tried to call her at 1:00 am on September 9, 2006, but she was asleep.

Reluctantly, and adversely to Petitioner, Hammonds also testified that she had seen Petitioner and Shala Williams say "hello" on previous occasions.  Mumbling when she testified, Hammonds indicated that Petitioner knew Williams's name.  Dkt. No. 10-3 at CM/ECF p. 203.   The People presented evidence from Officer Lenhart that Petitioner was shown a photo array on September 12, 2006, after Petitioner voluntarily accompanied investigators to the police station.  Among others, the array depicted Williams.  Petitioner made an unprompted statement after denying that anyone pictured on the array was at Brennan's home during the shooting.  Petitioner offered that while he knew the person depicted as number 5 in the array, he stated that he did not know that person's name or very much about him.  Dkt. No. 10-3 at CM/ECF p. 196.  Number 5 was Shala Williams.

The defense presented two witnesses.  James Ficarra testified that he had known Petitioner for about one and one-half years at the time of trial.  Dkt. No. 10-4 at CM/ECF p. 44 and following.  On September 8, 2006, Petitioner went to Ficarra's house around 10:30 or 11:00 p.m. and the two went to the Cobblestone Bar in Liverpool.  They then got a bag of marijuana and went back to Ficarra's house and Petitioner left between 2:45 and 3:00 a.m.  Ficarra did not recall telling Detective Murfitt that Petitioner was with him until about 1:00 or 2:00 a.m.

Tina Crump, who was 38 years old, was subpoenaed to come to court.  Dkt. No. 10-4 at CM/ECF p. 52, 63 and following.  Trial had to be delayed when she did not show up as planned.

Crump ultimately was located and testified that despite the difference in ages, she and Petitioner were friends, having met each other through Crump's daughter's ex-boyfriend. Dkt. No. 10-4 at CM/ECF p. 82 and following.  They used to talk on the phone all the time. The last time they talked was about five months before trial.  Crump testified that 315-863-1933, was her phone number, and Crump's sister, Ann Padilla, was the subscriber.

Crump acknowledged that, in one four-and-one-half-week period, there were over 50 phone calls between Crump's number and Petitioner's.  Crump also knew Clarence Paige. She knew him by the name "Quanie."  Quanie hung out on Ash Street where Crump used to live.  She admitted that Petitioner used to hang out on Ash street as well.

## II.  ANALYSIS

Petitioner claims, as he did on direct appeal, that his counsel was ineffective for a variety of errors.  Specifically, Petitioner claims that counsel: (a) failed to move to dismiss the felony murder count as duplicitous and not "cognizable"; (b) consented to an erroneous jury charge that shifted the burden of proof; (c) failed to object to the evidence that Petitioner was shown a photo array of Shala Williams; (d) failed to object to the prosecutor's summation comments; (e) failed to move for a trial order of dismissal on the ground that the People failed to prove Brennan's cause of death; (f) failed to request that the jury be instructed on the affirmative defense to felony murder; and (g) erred in eliciting La'Tesa Anderson's in-court identification of Petitioner.  The Appellate Division rejected Petitioner's claims.  It found, among other things, that "[a] defendant is not denied effective assistance of trial counsel merely because counsel does not make a motion or argument that has little or no chance of success. *People v. Backus*, 67 A.D.3d at 1429 (quoting *People v. Stultz*, 2 N.Y.3d 277, 287 (2004)).

14

### A. Applicable Law

The law relevant to this case is straightforward.   There are two relevant components of that law and they are related to each other.  They may be briefly summarized.

First, a federal court is "required to defer to a state court's adjudication of an issue on the merits, unless the state court's decision is 'contrary to, or involve[s] an unreasonable application of, clearly established Federal law ... [or is] based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" *Hawthorne v. Schneiderman*, 695 F.3d 192, 196 (2nd Cir. 2012) (even though "troubled by the outcome," giving AEDPA deference and affirming denial of the writ in the face of an ineffective assistance of counsel claim) (quoting 28 U.S.C. § 2254(d)).

Second, to succeed on a claim of ineffective assistance of counsel, a petitioner must demonstrate *both* that (1) the performance of his counsel was objectively unreasonable and (2) there is a reasonable probability that, but for his counsel's deficient performance, the result of the proceeding would have been different.  *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984).

The standards created by *Strickland* and AEDPA are both highly deferential.  When the two apply together, review is doubly deferential.  *See, e.g., Santone v.Fisher,* 689 F.3d 138, 154 (2nd Cir. 2012) (state court reasonably determined that petitioner was not deprived of effective assistance of counsel by counsel's failure to call prison guard as witness with respect to third-degree witness intimidation charge) (citations omitted)).

### B. The Law Applied to the Claims

Initially, the decision of the state appellate court was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.  Moreover, to the

degree that the decision of the state appellate court was factual in nature, Petitioner has failed to rebut the presumption of correctness by clear and convincing evidence.  With the foregoing stated, the following brief analysis is provided for each component of the claim.

### 1.    Failure to Move for Dismissal of the Indictment

Respecting the claim that the indictment was not "cognizable," that it was duplicitous and that counsel should have moved to dismiss it, the indictment charged "murder in the second degree" as follows:

> The said CODY A. BACKUS on or about the 9th day of September, 2006, at the City of Syracuse, in this county, in the course or and in furtherance of committing or attempting to commit Robbery or Burglary, and in the course of and in furtherance of such crime or of immediate flight there from, he or another participant caused the death of James Brennan, who was not a participant in the crime, to wit: defendant planned and participated in the burglary and robbery of James Brennan at his home and in the course of the burglary and robbery, the defendant or another participant shot and killed James Brennan.

Dkt. No. 9-2 at CM/ECF p. 13.

Since the jury found Petitioner guilty of both predicate crimes (robbery and burglary or attempted robbery and burglary), as well as the felony murder charge, any concern about lack of jury unanimity regarding the predicate crimes and the murder charge evaporates. Thus, the primary harm potentially caused by duplicity was not present here and Petitioner could not have been prejudiced by counsel's failure to move for dismissal.  Still further, since the predicate crimes were also charged as independent counts, there was no lack of fair notice.  Since the jury convicted Petitioner on these substantive counts, as well as the felony murder count, there could be no sentencing or double jeopardy problems.  Again, there was no prejudice flowing from counsel's decision not to challenge the indictment.  Finally, the state appellate court explicitly held that the felony murder count charged a crime under New

York law and as a result there was no jurisdictional defect.  *People v. Bachus*, 67 A.D.3d at

1429.  Thus, any argument that Petitioner was convicted of a non-existent crime due to

counsel's error falls by the wayside.

### 2. *Failure to Object to an Erroneous Jury Charge Shifting Burden of Proof*

As for the claim that counsel erred by consenting to an erroneous jury charge that

shifted the burden of proof, this assertion relates to the trial court's response to a jury

question.  Among several other questions, the jury asked about cell phone records.

The judge, with the agreement of counsel (Dkt. No. 10-4 at CM/ECF pp. 219-220),

gave the following instruction:

> THE COURT: I'm going to read the entire note and then read to you a response
> that the lawyers and I have agreed upon.
> This is note 8: "Regarding the cell phone procedures question, we are
> specifically trying to understand why more information/evidence was not
> produced regarding two cell phone numbers critical to the evidence: 1, 863-
> 1933, were the attorneys able to investigate other numbers called or received
> by this phone number.  Couldn't that info establish a pattern to define if this
> phone belonged to Clarence Paige or Tina Crump at the time of the crime?  2,
> 876-4502 was the number repeatedly called by Cody Backus immediately
> following the crime.  We are struggling to understand why the owner of this
> phone was not produced by attorney.  So were the subscribers available to the
> attorneys?  What are the procedures available to attorneys to investigate this
> info?  Are there privacy laws that dictate how this information can be
> investigated and introduced in the trial?"
> There are going to be a two-part answer to your question.  First, the
> parties agree that with respect to 863-1933 the records of the Cricket phone
> company were not available to either side for the months of August and
> September of 2006.  Second, beyond that you are not to speculate on what
> testimony or records may or may not exist relative to a particular telephone
> number.

Dkt. No. 10-4 at CM/ECF pp. 222-223.

Petitioner argues that the jury instruction wrongly shifted the burden of proof.  With

respect, no fair reading of the instruction suggests anything of the kind.  Essentially, the jury

instruction amounted to cautioning the jury not to speculate.  Petitioner's suggestion that defense counsel somehow erred by consenting to this instruction is weak at best.  More fundamentally, there is nothing prejudicial about this neutral and cautious instruction.

### 3. Failure to Object to Evidence that Petitioner was Shown a Photo Array of Shala Williams

As for the claim that counsel erred when he failed to object to the evidence that Petitioner was shown a photo array of Shala Williams, there is no support in this record for the assertion that the prosecution promised not to use that evidence sometime in the early summer when another lawyer was representing Petitioner.   Indeed, the record shows that the first defense lawyer candidly expressed uncertainty about whether Petitioner was in custody at the time of the array.  Dkt. No. 10-1 at CM/ECF p. 38.   In any event, by the time trial drew near in the fall, it was clear that the prosecutor intended to use that evidence and the record shows that the prosecutor made his intentions known to defense counsel and the court about a month before trial.  Dkt.  No. 10-1 at CM/ECF pp. 77-78.  Moreover, the prosecutor complied with the formal notice requirements of state law.  Dkt. No. 9-2 at CM/ECF p. 75.

The trial testimony showed that Petitioner was not in custody at the time of the photo array.  Petitioner went voluntarily to the police station, at the apparent encouragement of his parents; the photo array was completed within "minutes" of arriving at the police station; the showing itself apparently lasted only 5 minutes or so; and Petitioner was offered a ride home after the photo array was completed.  Dkt. No.10-3 at CM/ECF pp. 194, 197-198.

In short, counsel cannot reasonably be faulted for failing to object to this evidence when there was no likelihood that an objection would be sustained.

18

#### 4.     Failure to Object to the Prosecutor's Summation Comments

Regarding the claim that defense counsel erred by failing to object to a portion of the prosecutor's closing argument that related to Crump's testimony about her use of the phone that Paige claimed to have used, that portion of the closing argument is very brief.  It is only a few lines long in a summation that spans about 22 pages in the transcript.  The prosecutor questioned Crump's credibility and why, if the phone was really used by Crump, Crump did not produce the phone.  He also questioned why Crump, who used the phone for several years, did not present a phone bill (evidently to show that Crump was really using the phone because she was paying the bill).  However, the prosecutor then reminded the jury that: "It's not their burden.  It's my burden."  Dkt. No. 10-4 at CM/ECF p. 151.

Petitioner also attacks counsel for failing to object when the prosecutor argued, essentially, that Paige was not smart enough to make up the story, that it would have been easier to simply implicate Shala Williams rather than also falsely implicate Petitioner, and that if Paige had truthfully implicated only Williams, the prosecutor would "have given [Paige] the same deal."  Dkt. No. 10-4 at CM/ECF p. 148.  Petitioner also attacks his counsel for failing to object to the prosecutor's argument that if Paige was going to lie he would not have said anything about phones and specific numbers.  Petitioner highlights the fact that the prosecutor stated that "Clarence Paige is telling you the truth."  Dkt.  No. 10-4 at CM/ECF p. 153.  Again, the portion of the summation regarding Paige that Petitioner questions is brief–a few lines out of more than twenty pages of closing argument.

The decision of a criminal defense lawyer not to object and interrupt the prosecutor in a summation before a jury requires a sophisticated judgment call while in the "heat of battle." In this regard, a habeas judge must make "every effort" to "eliminate the distorting effects of

hindsight" by examining the lawyer's performance from "counsel's perspective at the time" of the alleged error. *Strickland*, 466 U.S. at 689-690. After reviewing the entirety of the summation and the evidence, recognizing that the questioned portions of the prosecutor's closing argument were arguably improper in certain spots but perfectly proper in others, and recognizing further that the arguably improper portions were very brief, the state appellate court's decision was reasonable.

### 5.      Failure to Move for Dismissal Regarding Cause of Death

Petitioner argues that his counsel was ineffective because he failed to move for dismissal on the grounds that the pathologist did not state the cause of death. Because death was not a seriously contested issue in this case, because the fact witnesses clearly established that Brennan had been shot by one of Petitioner's alleged accomplices and that Brennan was in bad shape when he left in the ambulance, because the forensic pathologist testified that he conducted the autopsy of Brennan on the day of the shooting, and because that pathologist testified that the gun shot occurred at close range and that the bullet tore through Brennan's liver, defense counsel was not ineffective for failing to make a motion that would have been summarily denied.

### 6.      Failure to Request an Instruction on the Affirmative Defense to Felony Murder

In New York, there are various affirmative defenses to felony murder that a defendant must prove in order to escape conviction. *See* McKinney's Penal Law § 125.25(3)(a)-(d) (November 1, 2006). For example, even though a burglary was committed by two people, and one person in furthering that crime kills the victim, the party who did not actually cause

the death, may prove as a defense that he or she had no reasonable grounds to believe that the killer intended to engage in conduct likely to result in death or serious injury.

Here, defense counsel cannot be faulted for failing to ask for an affirmative defense instruction because the theory of the case, compelled by Petitioner's statements to the police, was that Petitioner had nothing whatsoever to do with the aborted robbery and burglary and resulting death despite the fact that Petitioner was at the scene of the crime.  When viewed from the perspective of a jury, an affirmative defense instruction might well have seemed inconsistent.  Therefore, competent counsel could reasonably have thought it better to maintain a single coherent theory of the defense.  Counsel's strategic choice was a sensible one.  Moreover, it is very difficult to see how the failure to request such an instruction prejudiced Petitioner.  Petitioner had the burden of proof as to any such affirmative defense and a review of the evidence provides no reason to think that the jury would have concluded that Petitioner satisfied his burden.

### 7. *Eliciting La'Tesa Anderson's In-Court Identification of Petitioner*

Petitioner asserts that his counsel was ineffective for having Anderson identify him during cross-examination.  On cross-examination of Anderson, the following occurred:

Q.     And while you were in the apartment you didn't hear any exchanges between Jim and the guys who came in or the guys who came in and the white kid on the couch?

A.     No.

MR. MOYNIHAN: If I could have just one second, Your Honor?

THE COURT: Mm-hmm.

(Brief pause in the proceeding while Mr. Moynihan confers with his client.)

BY MR. MOYNIHAN:

21

Q.      Ms. Anderson?

A.      Yeah.

Q.      Do you see the person in the courtroom that gave you the cigarette?

A.      Yes.

Q.      Okay.  And can you point him out?

A.      Right over there.  (Indicating.)

MR. MOYNIHAN: May the record reflect that she's identified Mr. Backus?

THE COURT: Okay.

BY MR. MOYNIHAN:

Q.      Mr. Spano didn't ask you about that, right?

A.      No.

MR. MOYNIHAN: Nothing further, Your Honor.

THE COURT: Anything else, Mr. Spano?

MR. SPANO: No, Judge.  Thank you.

THE COURT: Okay.  Thank you, ma'am.  You're excused.

Dkt. No. 10-3 at CM/ECF pp. 135-136.

It is apparent from the foregoing that counsel consulted with Petitioner and then made a tactical decision to have Anderson identify Petitioner because the prosecutor failed to do so. This was an effective way of highlighting the defense's theory that Petitioner was at the scene, but not party to the "rip off."  It was also an effective way of saying "so what" to Anderson's testimony.  Counsel was not ineffective.  Moreover, since Petitioner told the police

he was at the scene, even if counsel erred, the error was not prejudicial since Anderson's identification was consistent with the theory of the defense.

### III.  CONCLUSION

Accordingly, it is hereby:

**Ordered** that the amended petition for a writ of habeas corpus is **denied**; and it is further

**Ordered**, that because the Court finds that Petitioner has not made a "substantial showing of the denial of a constitutional right" pursuant to 28 U.S.C. § 2253(c)(2), **no certificate of appealability** should be issued with respect to any of Petitioner's claims.  *See* 28 U.S.C. § 2253(c)(2) ("A certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."); and it is further

**Ordered,** that the Clerk serve a copy of this Decision and Order on all parties; and it is further

**Ordered**, that the Clerk enter judgment for the Respondent and against the Petitioner dismissing this matter with prejudice.

**IT IS SO ORDERED.**

Dated: December 21, 2012.

Syracuse, New York.

s/Richard G. Kopf
Senior U.S. District Judge